

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **4:24CR00010 RLW/SPM** |
| ) | |
| ASIM MUHAMMAD ALI, M.D., and ) | |
| MOHD AZFAR MALIK, M.D., ) | |
| ) | |
| Defendants. ) | |

## INDICTMENT

The Grand Jury charges:

## BACKGROUND

### A. Defendants

1. At all times relevant to this indictment, defendant Mohd Azfar Malik, M.D., ("Dr. Malik") was a psychiatrist, licensed to practice medicine in the state of Missouri. Since at least in or about 1996, Dr. Malik has owned, operated, been the medical director of, or otherwise been associated with one or more health care related businesses. These businesses include, among others, Behavioral Health Services LLC ("BHS"), AM Physicians LLC ("AMP"), Psych Care Consultants, L.L.C. ("PCC"), PsychCare Consultants Research, LLC ("PCCR"), Reimbursement Solutions LLC ("RSL"), Serenity Health LLC ("Serenity"), and COPE Ketamine Clinic ("COPE").

2. At all times relevant to this indictment, defendant Asim Muhammad Ali, M.D., ("Dr. Ali") was a medical doctor, licensed to practice medicine in the state of Missouri.

## B. Controlled Substances

3. Federal and state law classify certain prescription medications as "controlled substances." Controlled substances are drugs that have some potential for abuse or dependence. They are placed into five schedules, based on the potential for abuse and the severity of the effects if a person abuses the drug. 21 U.S.C. § 812(b).

4. As relevant to this indictment, schedule III drugs are drugs with less potential for abuse than drugs in schedules I and II but more potential for abuse than drugs in schedules IV and V. 21 U.S.C. § 812(b)(3)(A), (b)(4)(A), (b)(5)(A). Schedule III drugs may lead to "moderate or low physical dependence or high psychological dependence." 21 U.S.C. § 812(b)(3)(C). Ketamine and esketamine (an isomer of ketamine) are schedule III controlled substances. 21 C.F.R. § 1308.13(c)(7).

5. Federal law requires every person who dispenses controlled substances to obtain a Drug Enforcement Administration ("DEA") registration. 21 U.S.C. § 822(a)(2). The term "dispense" means to deliver a controlled substance to an ultimate user or research subject by, or pursuant to the lawful order of, a practitioner, including the prescribing and administering of a controlled substance. 21 U.S.C. § 802(10).

6. In order to obtain a DEA registration, a practitioner must be authorized to dispense controlled substances under the laws of the state in which the practitioner practices. 21 U.S.C. § 823(g)(1). To dispense controlled substances in Missouri, a practitioner must have a registration issued by the Bureau of Narcotics and Dangerous Drugs ("BNDD"). Mo. Rev. Stat. § 195.030.2.

7. "A separate [DEA] registration is required for each principal place of business or professional practice at one general physical location where controlled substances are manufactured, distributed, imported, exported, or dispensed by a person." 21 C.F.R. § 1301.12;

2

*see also* 21 U.S.C. § 822(e)(1). In other words, a provider must obtain a separate DEA registration for each location where he or she dispenses controlled substances.

### Dr. Malik's DEA Registrations

8.      At all relevant times, Dr. Malik had two DEA registrations, which authorized him to dispense controlled substances in schedules II through V at the respective registered location.

9.      More specifically, from on or about July 25, 2019 to on or about February 15, 2023, Dr. Malik's DEA registration ending in 7232 authorized him to dispense controlled substances from Suite 300 of the commercial building located at 5000 Cedar Plaza Parkway, St. Louis, Missouri 63128 (the "Cedar Plaza Building"). After on or about February 15, 2023, Dr. Malik changed the registered location of his DEA registration ending in 7232 such that it authorized him to dispense controlled substances from Suite 350 of the Cedar Plaza Building, which was the location of PCC's main office.

10.     From on or about August 30, 2007, to on or about April 29, 2019, Dr. Malik's DEA registration ending in 2984 authorized him to dispense controlled substances from the main office of PCC (again, located in Suite 350 of the Cedar Plaza Building). After on or about April 29, 2019, Dr. Malik changed the registered location of his DEA registration ending in 2984 several times to addresses associated with other PCC locations, including addresses with suite numbers at 763 South New Ballas Road in St. Louis, 4905 Mexico Road in St. Peters, and 11477 Olde Cabin Road in St. Louis.

11.     At no time did Dr. Malik have a DEA registration with a registered location in Suite 220 of the Cedar Plaza Building, which was where COPE was located.

### Dr. Ali's Lack of DEA Registration

12. At all times relevant to this indictment, Dr. Ali had no BNDD registration and no DEA registration.

### Restraints on Administration of a
### Controlled Substance By an Unregistered Practitioner

13. "An individual practitioner who is an agent or employee of another practitioner (other than a mid-level practitioner) registered to dispense controlled substances may, when acting in the normal course of business or employment, administer or dispense (other than by issuance of prescription) controlled substances if and to the extent that such individual practitioner is authorized or permitted to do so by the jurisdiction in which he or she practices, under the registration of the employer or principal practitioner in lieu of being registered him/herself." 21 C.F.R. § 1301.22(b). In short, a provider without a DEA registration, such as Dr. Ali, may administer controlled substances under the authority of a provider with a DEA registration, such as Dr. Malik, if the provider without a DEA registration is permitted to do so by the jurisdiction in which he or she practices (in this case, Missouri). The term "administer" refers to the direct application of a controlled substance to the body of a patient by a practitioner, whether by injection, inhalation, ingestion, or any other means. 21 U.S.C. § 802(2).

14. In Missouri, a practitioner with a registration to dispense controlled substances shall "[p]rovide direct supervision to employees or agents who assist in the administering or dispensing of controlled substances. Controlled substances shall not be dispensed from a registered practitioner's inventory unless the registered practitioner is physically in the registered location . . . ." 19 C.S.R. §§ 30-1.066(1)(A), § 30-1.011(1)(F).

15. Therefore, in Missouri, a practitioner without a DEA registration may only administer controlled substances, such as ketamine, if physically situated in the registered location

and if being directly supervised by and in the physical presence of the practitioner under whose DEA registration the controlled substances are being dispensed.

16. Thus, at all times relevant to the indictment, Dr. Ali could only administer ketamine at one of Dr. Malik's DEA registered clinic locations if Dr. Malik was directly supervising Dr. Ali and physically present in the clinic at the time Dr. Ali was administering the ketamine.

17. If the clinic was not a DEA registered location, neither Dr. Ali nor anyone else could administer ketamine at that location, regardless of whether Dr. Malik was physically present.

## Spravato and the "REMS" Program

18. Spravato is a prescription nasal spray indicated to treat adults with treatment-resistant depression and depressive symptoms in adults with major depressive disorder with suicidal thoughts or actions. Because the active ingredient in Spravato is esketamine, Spravato is a schedule III controlled substance.

19. Due to the risks of sedation, dissociation, respiratory depression, and abuse and misuse, Spravato is only available through a restricted, Food and Drug Administration-mandated program called the Spravato Risk Evaluation and Mitigation Strategy Program (the "REMS Program"). Outpatient providers must be certified in the REMS Program in order to dispense Spravato.

20. To become enrolled in the REMS Program, outpatient providers, either directly or through their authorized representatives, must certify compliance with the REMS Program requirements.

21. The REMS Program requirements include, among other things, that: (1) prior to treatment with Spravato, a healthcare provider must counsel the patient on the need for patient monitoring after treatment and the risks of sedation, dissociation, and changes in vital signs; (2)

5

Spravato must be administered under the direct supervision of a healthcare provider; (3) a health care provider must be onsite to monitor the patient for at least two hours for resolution of sedation and dissociation and changes in vital signs after every dose; and (4) a prescriber must be onsite during Spravato administration and monitoring.

### C. The Medicare Program

22. The United States Department of Health and Human Services, through the Centers for Medicare & Medicaid Services ("CMS"), administers the Medicare program, which is a federal health benefit program within the meaning of 18 U.S.C. § 24(b) that affects interstate commerce and provides the elderly and disabled with medical benefits, items, and services.

23. Benefits are administered through different parts of the Medicare program, referred to as Part A, Part B, Part C, and Part D, which relate to different services provided through the Medicare program.

24. Medicare Part B reimburses health care providers for covered health care services provided to Medicare beneficiaries in outpatient settings. CMS administers Medicare Part B through its statutory fiscal agents, called Medicare Administrative Contractors or "MACs." The MACs are private entities that review claims and make payments to providers for services rendered to Medicare beneficiaries. The MACs are responsible for processing Medicare claims arising within their assigned geographic areas, including determining whether the claim is for a covered service. Wisconsin Physicians Service Insurance Corporation ("WPS") is the Part B MAC for Eastern Missouri and thus processes reimbursement claims that Dr. Malik—as an individual or through his businesses—submitted to Medicare.

25. To receive Medicare Part B reimbursement, providers must make appropriate application to the MAC and execute a written provider agreement. The provider agreement

obligates the provider to know, understand, and follow all Medicare regulations and rules. The Medicare application further requires the provider to disclose each location at which he or she will be providing Medicare services; otherwise, the provider is not enrolled to provide Medicare services at such locations. After successful completion of the application process, the MAC assigns the provider a unique provider number, which is a necessary identifier for billing purposes.

26. Medicare rules and regulations require its enrolled providers to report certain events, including, without limitation, (1) any update in the provider's practice location(s), and (2) any suspension of the provider's participation in the Medicaid program, which is a health care benefit program—jointly funded by the State of Missouri and, through CMS, the federal government—that provides low-income citizens of Missouri with medical benefits, items, and services.

27. Medicare rules and regulations further set forth that providers may be revoked from participation if, among other things, they are terminated, revoked, or otherwise barred from participating in a state Medicaid program, or if they fail to meet their reporting obligations regarding a change of practice location to Medicare.

### Dr. Malik's Enrollment in Medicare

28. Dr. Malik has been an enrolled Medicare provider since at least January 1991. Over the years, Dr. Malik filled out several Medicare provider applications. In one such instance, April 13, 2015, Dr. Malik signed a Medicare application that contained Section 14, entitled "Penalties for Falsifying Information," which informed Dr. Malik that he could be criminally prosecuted (a) for executing or attempting to execute a health care fraud scheme or using false or fraudulent statements or representations to obtain money from a health care benefit program or (b) making or using false or fraudulent statements or representations in connection with the delivery or payment

7

for health care benefits, items, or services. As part of the application, Dr. Malik signed the "Certification Statement" of the application and thereby certified:

> I have read and understand the Penalties for Falsifying Information, as printed in the application. I understand that any deliberate omission, misrepresentation, or falsification of any information . . . contained in any communication supplying information to Medicare . . . [may be criminally prosecuted].
>
> I agree to abide by the Medicare laws, regulations and program instructions . . .
>
> I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

### Dr. Ali's Lack of Enrollment to Provide Medicare Services at Dr. Malik's Practices

29. Beginning at latest in or about December 2003, Dr. Ali was an enrolled Medicare provider who had completed several Medicare applications, including one in February 2015 that contained the "Penalties for Falsifying Information" and the "Certification Statement" described in paragraph 28, above. Prior to in or about March 2020, Dr. Ali was also participating provider in the Missouri Medicaid program beginning at least in or about July 2003.

30. However, beginning in or about March 2020, Dr. Ali became suspended from participating in the Missouri Medicaid program. As a result, Dr. Ali had a duty to report this suspension to the Medicare program.

31. Additionally, beginning at least as early as in or about December 2020, and as further described below in this indictment, Dr. Ali became affiliated with Dr. Malik and began performing services for Medicare beneficiaries through Dr. Malik's entities, including PCC. As a result, Dr. Ali had a duty to report this update in his practice location to Medicare.

32. Dr. Ali did not fulfill his duties to inform Medicare that (1) he was suspended from the Medicaid program; and (2) he was providing services to Medicare beneficiaries through Dr. Malik's entities, including PCC. In other words, at all times relevant to this indictment, Dr. Ali

8

was not enrolled to provide Medicare services at PCC or any other medical businesses with which Dr. Malik was associated. Moreover, had Dr. Ali reported to Medicare that he was suspended from the Medicaid program, as required, he would have been revoked from participating in Medicare.

## COUNT 1
### Conspiracy to Illegally Distribute Controlled Substances and to Maintain a Drug-Involved Premises
### 21 U.S.C. § 846

The Grand Jury further charges that:

33. The above allegations are incorporated by reference as if fully set out herein.

34. Beginning in or about December 2020, and continuing to at least in or about March 2023, in St. Louis, Missouri, in the Eastern District of Missouri and elsewhere, the defendants,

ASIM MUHAMMAD ALI, M.D., and
MOHD AZFAR MALIK, M.D.

knowingly and intentionally combined, conspired, confederated, and agreed together and with each other, and with other persons known and unknown to the Grand Jury, to commit the following offenses against the United States: to distribute and possess with the intent to distribute ketamine and esketamine, both schedule III controlled substances, in violation of Title 21, United States Code, Sections 841(a)(1), and to maintain drug-involved premises by managing and controlling a place and knowingly and intentionally making it available for use for the purpose of unlawfully storing and distributing ketamine and esketamine, both schedule III controlled substances, in violation of Title 21, United States Code, Sections 856(a)(2), all in violation of 21 U.S.C. § 846.

### Manner and Means of the Conspiracy

The defendants accomplished and attempted to accomplish the objects of the drug trafficking conspiracy in the following manner and through the following means:

9

## Businesses Associated with Dr. Malik

35. It was part of the drug trafficking conspiracy that Dr. Malik operated medical clinics and medical-related businesses, further described below, and that he and Dr. Ali used these businesses as a means of committing the criminal offenses described in this indictment.

36. In or about December 2016, Dr. Malik and others unknown to the Grand Jury created BHS, which served as an umbrella entity for several other businesses operated by Dr. Malik, including PCC, RSL, and COPE.

37. At all times relevant to this indictment, PCC was a psychiatric clinic with locations in St. Charles, St. Peters, North St. Louis County, and South St. Louis County; PCC's main office, situated in Suite 350 of the Cedar Plaza Building, was located in South St. Louis County. At all times relevant to this indictment, the Cedar Plaza Building was owned by Cedar Plaza LLC, a Missouri limited liability company controlled and operated, in whole or in part, by Dr. Malik.

38. At all times relevant to this indictment, RSL was a medical billing company that conducted billing for PCC and other medical entities associated with Dr. Malik. RSL was located in Suite 120 (in the basement) of the Cedar Plaza Building.

39. In or about late 2018, Dr. Malik created COPE, a clinic designed to provide ketamine infusions, which are intravenous ketamine administrations typically aimed at treating serious mental health illnesses, such as treatment-resistant depression, anxiety disorders, and post-traumatic stress disorder. COPE was located in Suite 220 (on the second floor) of the Cedar Plaza Building.

40. At no time did Dr. Malik have a DEA registration to administer controlled substances from Suite 220 of the Cedar Plaza Building, *i.e.* the location of COPE.

### Illegal Ketamine Infusions Given by Dr. Ali Using Dr. Malik's DEA Registration

41. It was part of the drug trafficking conspiracy that, beginning in or about December 2020, Dr. Malik and Dr. Ali agreed that Dr. Ali, who knew he could not administer controlled substances given his lack of a DEA and a BNDD registration, would use Dr. Malik's DEA registration to administer ketamine infusions to patients in Suite 220 of the Cedar Plaza Building without direct supervision by Dr. Malik and outside of Dr. Malik's physical presence. Dr. Malik knew that Dr. Ali did not have a DEA registration, and therefore, could not lawfully dispense controlled substances, including ketamine, without Dr. Malik's physical presence and supervision.

42. It was further part of the drug trafficking conspiracy that, although Dr. Malik knew he was required to provide direct supervision and be physically present for infusions of ketamine ordered under his DEA registration number, he allowed Dr. Ali to conduct ketamine infusions without supervision and outside of his presence. In fact, following the commencement of the coronavirus disease ("COVID-19") pandemic in early 2020, Dr. Malik rarely ever came into the Cedar Plaza Building, and was sometimes out of town while Dr. Ali was conducting ketamine infusions.

43. It was further part of the drug trafficking conspiracy that Dr. Ali and Dr. Malik determined that Dr. Malik could simply "say hi" to the ketamine patients, typically via telephone, as a purported justification for Dr. Ali handling their ketamine treatment in the absence of Dr. Malik's physical presence or supervision while using Dr. Malik's DEA registration.

44. It was further part of the drug trafficking conspiracy that, pursuant to the agreement between Dr. Malik and Dr. Ali, Dr. Malik, through one or more of his businesses, paid Dr. Ali for each ketamine infusion that Dr. Ali administered to a patient.

**Illegal Spravato Treatments Provided by Dr. Ali Using Dr. Malik's DEA Registration**

45. It was part of the drug trafficking conspiracy that, at least as early as in or about December 2020, Dr. Malik became enrolled in the REMS Program, authorizing him to administer Spravato and subjecting him to all of the requirements of the REMS Program, including that a prescriber must be onsite during Spravato administration and the two-hour monitoring period.

46. It was part of the drug trafficking conspiracy that Dr. Ali and Dr. Malik eventually agreed that Dr. Ali could administer not only ketamine infusions under Dr. Malik's DEA registration number, but also Spravato treatments. Like the ketamine infusions, the Spravato administrations were conducted by Dr. Ali in Suite 220 of the Cedar Plaza Building outside of Dr. Malik's presence and without supervision, even though (1) Dr. Ali knew he could not administer controlled substances without a DEA and BNDD registration, and (2) Dr. Malik knew he was required to satisfy the REMS Program requirements, to provide direct supervision, and to be physically present for Spravato treatments, and (3) that the Suite 220 COPE clinic location did not have the legally required DEA registration, and that, therefore, no controlled substances could be administered at that location.

**Illegal Storage and Distribution of Controlled Substances in Suite 220 of the Cedar Plaza Building**

47. It was part of the drug trafficking conspiracy that Dr. Malik and Dr. Ali agreed to maintain drug-involved premises by managing and controlling Suite 220 of the Cedar Plaza Building and knowingly and intentionally making Suite 220 of the Cedar Plaza Building available for the purpose of unlawfully storing and distributing ketamine and esketamine, both schedule III controlled substances, in violation of 21 U.S.C. § 856(a)(2).

All in violation of 21 U.S.C. § 846.

# COUNT 2
## Conspiracy to Commit Health Care Fraud
## 18 U.S.C. § 1349

The Grand Jury further charges that:

48. The above allegations are incorporated by reference as if fully set out herein.

49. Beginning in or about December 2020, and continuing to at least in or about March 2023, in St. Louis, Missouri, in the Eastern District of Missouri and elsewhere, the defendants,

ASIM MUHAMMAD ALI, M.D., and
MOHD AZFAR MALIK, M.D.,

knowingly and intentionally combined, conspired, confederated, and agreed together and with each other, and with other persons known and unknown to the Grand Jury, to commit the following offenses: to knowingly and willfully execute a scheme and artifice to defraud the Medicare program, a health care benefit program as defined in 18 U.S.C. § 24(b), in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Sections 1347(a)(1), and to obtain, by means of false and fraudulent pretenses, representations, and promises, the money owned and under the custody and control of the Medicare program, a health care benefit program as defined in 18 U.S.C. § 24(b), in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Sections 1347(a)(2), all in violation of 1349.

**A. Purpose of the Conspiracy**

50. Dr. Malik and Dr. Ali, and others known and unknown to the Grand Jury, conspired to commit health care fraud in order to make money, profit, and unjustly enrich themselves.

**B. Manner and Means of the Conspiracy**

51. The defendants accomplished and attempted to accomplish the objects of the health care fraud conspiracy in the following manner and through the following means:

13

52. It was part of the health care fraud conspiracy that Dr. Malik and Dr. Ali agreed that Dr. Ali would perform certain services for Medicare beneficiaries who were patients of PCC, as further described below. Dr. Malik and Dr. Ali agreed that, in conducting these services, Dr. Ali would falsely use Dr. Malik's name and Medicare billing number, even though both Dr. Malik and Dr. Ali knew that Dr. Ali was not enrolled to provide Medicare services at PCC and that the services he provided were not reimbursable by Medicare.

53. More specifically, it was part of the health care fraud conspiracy that Dr. Ali conducted Medicare "Annual Wellness Visits," which are yearly appointments in which the provider, among other things, develops creates or updates a personalized prevention plan and performs a cognitive assessment for signs of dementia, including Alzheimer's disease. Dr. Ali and Dr. Malik caused Medicare to be falsely billed for Annual Wellness Visits conducted by Dr. Ali as if they had been conducted by Dr. Malik, who was enrolled in Medicare.

54. It was further part of the health care fraud conspiracy that Dr. Ali performed administrations of Spravato on Medicare beneficiaries, and that Dr. Ali and Dr. Malik then caused Medicare to be falsely billed for services associated with Dr. Ali's Spravato treatments as if they had been conducted by Dr. Malik, a Medicare provider.

55. It was part of the health care fraud conspiracy that, when Dr. Ali provided the above-described services that were falsely billed to Medicare, he and Dr. Malik agreed that they would conceal that Dr. Ali was the actual rendering provider by having Dr. Malik, not Dr. Ali, sign the medical notes associated with the services.

56. It was further part of the health care fraud conspiracy that Dr. Malik, through one or more of his businesses, paid Dr. Ali for each service that he conducted that was falsely billed to Medicare using Dr. Malik's name and billing number.

14

57. As part of the health care fraud conspiracy, the conspirators exchanged and received the following communications:

    a. On or about January 26, 2021, Dr. Ali emailed to BHS staff, including staff of RSL, a list of patients on whom he had conducted Medicare Annual Wellness Visits and the dates on which he had done so. The purpose of the email was in furtherance of submitting claims for those visits to Medicare (falsely using Dr. Malik's name and billing number).

    b. On or about December 27, 2021, Dr. Ali emailed the controller of RSL and stated he had conducted a Spravato treatment and further inquired how much he would be paid for it.

    c. On or about December 27, 2021, the controller of RSL emailed Dr. Malik and proposed that Dr. Ali should be compensated a percentage of the collections received for Spravato treatments. In response to the proposal, Dr. Malik replied, "Yes I agree."

All in violation of 18 U.S.C. § 1349.

## COUNTS 3 THROUGH 14
### Illegal Distribution of a Controlled Substance
### 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2

The Grand Jury further charges that:

58. The above allegations are incorporated by reference as if fully set out herein.

59. On or about the dates listed below, in St. Louis, Missouri, in the Eastern Division of the Eastern District of Missouri and elsewhere, the defendants,

    ASIM MUHAMMAD ALI, M.D., and
    MOHD AZFAR MALIK, M.D.

aided and abetted by, and aiding and abetting each other, and others known and unknown to the Grand Jury, knowingly and intentionally distributed the substances listed below, all of which are schedule III controlled substances, in violation of Title 21, United States Code, Section 841(a)(1)

15

and Title 18, United States Code, Section 2, in that Dr. Ali, who had no DEA registration, administered the substance indicated outside of the presence of and without the direct supervision of Dr. Malik, under whose DEA registration number the controlled substances were administered:

| Count | Patient Initials | Date of Administration | Controlled Substance/ Administration Type |
|---|---|---|---|
| 3 | S.T. | 2/6/2021 | Ketamine/Intravenous infusion |
| 4 | C.G. | 2/6/2021 | Ketamine/Intravenous infusion |
| 5 | T.A. | 12/23/2021 | Spravato (esketamine)/Nasal spray |
| 6 | T.A. | 12/31/2021 | Spravato (esketamine)/Nasal spray |
| 7 | J.C. | 10/15/2022 | Ketamine/Intravenous infusion |
| 8 | K.B. | 10/15/2022 | Ketamine/Intravenous infusion |
| 9 | S.T. | 10/22/2022 | Ketamine/Intravenous infusion |
| 10 | T.H. | 10/22/2022 | Ketamine/Intravenous infusion |
| 11 | R.B. | 10/22/2022 | Ketamine/Intravenous infusion |
| 12 | C.J. | 10/22/2022 | Ketamine/Intravenous infusion |
| 13 | O.O. | 10/29/2022 | Ketamine/Intravenous infusion |
| 14 | J.C. | 10/29/2022 | Ketamine/Intravenous infusion |

All in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

### COUNTS 15 THROUGH 21
### False Statements Related to Health Care Matters
### 18 U.S.C. §§ 1035 and 2

The Grand Jury further charges that:

60. The above allegations are incorporated by reference as if fully set out herein.

61. On or about the dates listed below, in St. Louis, Missouri, in the Eastern Division of the Eastern District of Missouri and elsewhere, the defendants,

ASIM MUHAMMAD ALI, M.D., and
MOHD AZFAR MALIK, M.D.

aided and abetted by, and aiding and abetting each other, and others known and unknown to the Grand Jury, knowingly and willfully made and used materially false writings and documents, knowing the same to contain materially false, fictitious, and fraudulent statements and entries, in

16

connection with the delivery of and payment for health care benefits, items, and services involving the Medicare program, a health care benefit program as defined in 18 U.S.C. § 24(b), in violation of 18 U.S.C. § 1035, in that the defendants falsely stated and represented in claims for payment that services were rendered by Dr. Malik when, in fact, they were rendered by Dr. Ali, whose services were not reimbursable by the Medicare program, when the defendants then and there well knew said statements and representations were false, fictitious, and fraudulent, as follows:

| Count | Patient Initials | Date of Service | Service Billed | Date Paid | Amount Paid by Medicare |
|---|---|---|---|---|---|
| 15 | T.A. | 12/11/2020 | G0439 - Annual wellness visit | 1/29/2021 | $109.52 |
| 16 | V.C. | 12/16/2020 | G0439 - Annual wellness visit | 1/29/2021 | $109.52 |
| 17 | J.H. | 1/5/2021 | G0439 - Annual wellness visit | 1/30/2021 | $131.65 |
| 18 | M.L. | 1/8/2021 | G0439 - Annual wellness visit | 1/29/2021 | $131.65 |
| 19 | R.L. | 1/11/2021 | G0439 - Annual wellness visit | 1/29/2021 | $131.65 |
| 20 | T.A. | 12/23/2021 | 99215 - Office visit | 2/3/2022 | $144.40 |
| 21 | T.A. | 12/23/2021 | G2212 - Prolonged office or other outpatient evaluation | 2/3/2022 | $105.76 |

All in violation of 18 U.S.C. §§ 1035 and 2.

## COUNT 22
**Maintaining Drug-Involved Premises**
**21 U.S.C. § 856(a)(2) and 18 U.S.C. § 2**

The Grand Jury further charges that:

62. The above allegations are incorporated by reference as if fully set out herein.

63. Beginning in or about December 2020 and continuing through in or about March 2023, in St. Louis, Missouri, in the Eastern Division of the Eastern District of Missouri, the defendants,

ASIM MUHAMMAD ALI, M.D., and
MOHD AZFAR MALIK, M.D.

aided and abetted by, and aiding and abetting each other, and others known and unknown to the Grand Jury, did unlawfully manage and control a place located at 5000 Cedar Plaza Parkway, Suite 220, St. Louis, Missouri 63128 and did knowingly and intentionally make that place available for use for the purpose of unlawfully storing and distributing controlled substances, namely, ketamine and esketamine, in violation of Title 21, United States Code, Section 856(a)(2).

## **FORFEITURE ALLEGATION**

1. The allegations contained in Count 1 of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 21, United States Code, Section 853.

2. Pursuant to Title 21, United States Code, Section 853, upon conviction of an offense in violation of Title 21, United States Code, Section 846, the defendants, ASIM MUHAMMAD ALI, M.D. and MOHD AZFAR MALIK, M.D. ("the defendants"), shall forfeit to the United States of America any property constituting, or derived from, any proceeds obtained, directly or indirectly, as the result of such offense and any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, the offense.

3. The allegations contained in Count 2 of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 982(a)(7).

4. Upon conviction of the offense in violation of Title 18, United States Code, Section 1349 set forth in Count 2 of this Indictment, the defendants shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the

commission of the offenses.

5. The allegations contained in Counts 3-14 of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 21, United States Code, Section 853.

6. Pursuant to Title 21, United States Code, Section 853, upon conviction of an offense in violation of Title 21, United States Code, Section 841, the defendants shall forfeit to the United States of America any property constituting, or derived from, any proceeds obtained, directly or indirectly, as the result of such offenses and any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, the offenses.

7. The allegations contained in Counts 15-21 of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 982(a)(7).

8. Upon conviction of the offenses in violation of Title 18, United States Code, Section 1035 set forth in Counts 15-21 of this Indictment, the defendants shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offenses.

9. The allegations contained in Count 22 of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeiture pursuant to 21 U.S.C. § 853.

10. Pursuant to 21 U.S.C. § 853, upon conviction of the offense in violation of 21 U.S.C. § 856 set forth in Count 22 of this Indictment, the defendants shall forfeit to the United States any property constituting, or derived from, any proceeds obtained, directly or indirectly, as the result of such offense, and any property used, or intended to be used, in any manner or part, to

commit, or to facilitate the commission of, the offense.

11. If any of the property described above, as a result of any act or omission of the defendants

   a. cannot be located upon the exercise of due diligence;

   b. has been transferred or sold to, or deposited with, a third party;

   c. has been placed beyond the jurisdiction of the court;

   d. has been substantially diminished in value; or

   e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), including, but not limited to, a money judgment in an amount equivalent to any sum subject to forfeiture as described above.

A TRUE BILL

_____
FOREPERSON

SAYLER A. FLEMING
United States Attorney

_____
AMY E. SESTRIC, #66219MO
Assistant United States Attorney